

03/31/2008

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CYNTHIA CLAYBROOK, | § | Case No. 04-44541 |
| | § | (Chapter 7) |
| Debtor. | § | |
| | § | |
| | § | |
| RODERICK BELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. No. 05-4013 |
| | § | |
| CYNTHIA CLAYBROOK, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Before the Court is the Complaint for Objection to Discharge of Cynthia Claybrook pursuant to 11 U.S.C. §§ 523 and 727 (the "<u>Complaint</u>") filed by Roderick Bell (the "<u>Plaintiff</u>" or "<u>Bell</u>") against Cynthia Claybrook (the "<u>Defendant</u>" or "<u>Claybrook</u>"). The Complaint seeks an order denying the Defendant a discharge pursuant to 11 U.S.C. §727(a)(3) and (a)(5) or, alternatively, an order declaring the Defendant's obligations to the Plaintiff to be nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and awarding the Plaintiff interest and attorneys' fees. The Court tried the Complaint on July 31 and December 3, 2007, at which time the parties presented argument and evidence. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law and disposes of all issues before the Court. *See* FED. R. BANKR. P. 7072.

## JURISDICTION

This Court has jurisdiction to consider the Complaint pursuant to 28 U.S.C. §§1334 and 157(a). The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(A), (I), (J), and (O).

## FACTUAL AND PROCEDURAL BACKGROUND

The Defendant is a college graduate and holds a Master of Science in Accounting as well as a Master of Science Degree in Informational Technology. Beginning in May 1994, Bell employed the Defendant as an accountant for himself and his companies, including a trucking company named Texas American Express, Inc. ("TAXI"). The Defendant was a certified public accountant at that time but relinquished her certification in 2003.

The Defendant was primarily responsible for the accounting operations of Bell's businesses, including the preparation of W-2s and 1099s for TAXI's employees and contractors. She was also the registered agent for TAXI, and she functioned as the chief financial officer for TAXI from approximately July 1999, when TAXI's prior chief financial officer departed, until approximately December 2000, when TAXI ceased doing business. Although Bell contended at trial that the Defendant was not officially appointed by TAXI as its chief financial officer, there is no dispute that he occasionally held the Defendant out as such.

TAXI's business offices were located at the south end of a warehouse in Garland, Texas. The entry to the accounting department was located in the middle of a long hallway. The Defendant testified that she sat at a desk in the entry area for the

2

accounting department.  The entry area had no doors.  In addition to the desk used by the Defendant, the entry area contained a couple of printers, some of TAXI's business records, and personal items belonging to the Defendant.

Bell paid the Defendant on a part-time basis as a contract consultant.  Bell testified, credibly, that the Defendant's rate was originally $30 an hour and was $50 an hour during the relevant time period.[1]  Bell further testified, and the documentary evidence reflects, that the Defendant would periodically submit written requests to Bell for payment for the hours she had worked and that he would write a check to her based on those hours multiplied by her hourly rate.

At trial, the Defendant testified that she was compensated separately for her role as a contract accountant and for her role as TAXI's chief financial officer.  However, the Defendant's testimony was not supported by her prior sworn statements or the documentary evidence presented at trial.  Although she claimed to be entitled to additional compensation as TAXI's chief financial officer at trial, the Defendant failed to disclose that she was an officer of TAXI in response to Question No. 18(a) in her Statement of Financial Affairs ("SOFA").[2]  In both her SOFA and her Schedule I (Current Income of Individual Debtor), the Defendant represented under oath that she had been self-employed as a consultant since 1994.  The documentary evidence presented at

---

[1] The Defendant testified that she filed an unemployment claim against the Plaintiff and received unemployment payments based on that claim from the Texas Workforce Commission.  It is unclear from the record, however, on what basis the Texas Workforce Commission made its finding as to the Defendant's employment status.

[2] Question No. 18(a) states:  If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending date of all businesses in which the debtor was an officer, director, partner or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting equity securities within the six years immediately preceding the commencement of this case.

trial simply reflects that the Defendant was paid for the time spent working for Bell's businesses.

TAXI paid the Defendant more than $88,000 for her services in 1999. After TAXI ceased doing business in 2000, she continued to assist with document production in connection with ongoing litigation between TAXI and International Harvester Corporation, among others. She also continued to provide accounting services for Bell's other businesses, and she began taking the courses necessary for a doctoral degree. However, the Defendant testified that her pay dropped drastically during 2000. The Defendant further testified that Bell instructed her to keep separate records of the time she spent on TAXI's pending lawsuits so that he could share the proceeds of any future settlement with her by paying her $200 - $250 an hour for that time. Bell denied the existence of any such agreement at trial, and the Defendant failed to produce any documentary or other evidence, such as separate contemporaneous time records, in support of her testimony.

In January 2002, the Defendant asked Bell for $25,000 to buy a car. Bell had, occasionally, loaned money to his employees in the past. Bell testified, credibly, that it was not his habit to forgive those debts. Bell's testimony on this issue was supported by the testimony of Archie Smith, who received a $25,000 loan from Bell in 1999 and who testified that he regarded that loan as still outstanding. The Defendant's contrary testimony that Bell routinely forgave loans to his employees was inconsistent with her testimony that the $25,000 constituted payment for work performed and was not credible.

Bell agreed to loan the Defendant $25,000 and issued a check to the Defendant from his personal bank account. The check was generated from Quicken, and the

voucher stub indicated that the check was issued for a "miscellaneous expense." Bell testified, credibly, that Quicken required all checks to be categorized before they could be printed, and that he categorized the $25,000 check as a "miscellaneous expense" rather than take the time to create a new category: "Miscellaneous expense seemed as innocuous as any other category I had in my accounting." Trial Tr. (July 31, 2007) at p. 71, lines 14-16.

The Defendant executed a promissory note dated January 7, 2002, in connection with the loan from Bell. The promissory note was in principal amount of $25,000 with interest at the rate of seven percent, and was to be repaid to Bell in monthly payments of $2,580.47 beginning on February 9, 2002. The Defendant, who had recently been bitten by a dog on her dominant hand, was wearing a medical device on that hand when she signed the promissory note.

The Defendant's testimony that her hourly rate was $200 and that the payment of $25,000 was an advance for future work was not credible. After receiving $25,000 from Bell in January 2002, the Defendant continued to request payments from Bell for her work as a contract accountant. The documentary evidence reflects that, between January 16, 2002 and October 18, 2002, Bell requested and received payment for work in the approximate amount of $31,000 at the rate of $50 per hour. Moreover, the Defendant's testimony that the $25,000 was an advance or retainer is inconsistent with her claim that Bell owes her $189,000 for the accounting services she provided in 2002.

The Defendant failed to make any payments to Bell in repayment of the loan, and Bell did not make any demand for payment from the Defendant. The Defendant's claim that Bell knew or should have known, based on the drop in income that she was receiving

from TAXI, that she could not possibly repay the promissory note was neither credible nor consisted with her own testimony that she never disclosed her financial condition to Bell because "I'm a private person. I don't do that." Trial Tr. (Dec. 3, 2007) at p. 47, line 16. Moreover, the Defendant failed to establish that her work for Bell's businesses precluded other employment or that Bell was aware that she had not procured other employment to supplement her income after TAXI ceased doing business.

On the first day of trial in July 2007, the Defendant testified that she had stored some personal belongings inherited from her father's probate estate as well as her personal financial records in an unused office located in TAXI's warehouse. Archie Smith testified on the same day that, at the Defendant's request, he had placed the Defendant's personal property into the unused office and that none of the property included her financial records. On the second day of trial, the Defendant contradicted her prior testimony be testifying that her personal records were located in the entry area where she worked for TAXI.[3]

In October 2002, Bell initiated an acrimonious confrontation with the Defendant. Bell testified at trial as to the substance of this confrontation, as follows:

> She came into my office one day and claimed that I owed her about $200,000 in back pay. She claimed that because I had in a deposition made the statement that she was chief financial officer and that the chief financial officer of a company is absolutely necessary to be an employee. And I had not in the years she had assumed that position, had not paid her as an employee. Had not turned in 941 taxes on her. And that if I would pay her $100,000, she would forget the whole mess …. And not report me to the IRS.

---

[3] The Defendant also testified on the second day of trial that Bell's attorney, Charles Gale, carried the boxes of her personal records into the entry area for her. Mr. Gale, conveniently enough, was not a witness in this adversary proceeding. Another attorney for Bell, Eric Jaegers, testified that the Defendant had represented that her financial documents were stored in a locked room at Bell's warehouse in response to Bell's pre-bankruptcy discovery requests. Mr. Jaegers inventoried the items the Defendant had stored in the unused office, and he testified, credibly, that those items did not include the Defendant's financial documents.

6

Trial Tr. (Dec. 3, 2007) at p. 61, line 25, and p. 62, lines 1-10.  In contrast, the Defendant

described the confrontation as follows:

> Well, [Rod Bell] was in a pretty pissy mood.  And I told him I was tired of
> being abused.  I was tired of him stealing money from his employees and
> so forth and so on.  He had gotten in a bunch of money that summer, a
> bunch.  He had sold off property.  He had sold two houses he invested
> some of his money in.  And before he may have been cash poor, but at that
> point in time he was not.  And he, you know, and even though he had all
> this cash that had come in and he was taking all of this cash out of TAXI,
> he still would not pay the employees what they were due, or anything else.
> And we had a conversation about it.  I cried.  Something came up in the
> conversation about Enron and he's like, Well, I'm not Enron.  That's
> different.

Trial Tr. (Dec. 3, 2007) at p. 39, lines 18-25, and p. 40, lines 1-5.  The Defendant denied

that she attempted to extort Bell:

> I told him that I thought he was committing fraud.  That the whole
> liquidation thing was in effect.  And him taking money from people's
> paychecks was fraudulent.  You know, there's a 100 percent penalty from
> the IRS about payroll tax, and so forth and so on.

Trial Tr. (Dec. 3, 2007) at p. 43, lines 13-17.[4]

The Defendant left the premises immediately after the confrontation, leaving all

of her personal possessions behind.  Bell sent the Defendant a termination letter several

days later.  He also contacted the Garland Police Department, claiming that the

Defendant had attempted to extort him, and he filed a complaint with the Texas Society

of Certified Public Accountants.

---

[4] The Defendant offered the testimony of Robin Drake to support her claims of wrongdoing by
Bell.  Ms. Drake worked for TAXI from September 1999 through February 2001. Ms. Drake was studying
for an undergraduate degree in finance when she began working for TAXI.  Ms. Drake testified that TAXI
had no real need for a chief financial officer.  She further testified that the Defendant planned to "move on"
after she finished her graduate studies that she (Ms. Drake) was to take over the Defendant's accounting
responsibilities.

After receiving the termination letter from Bell, the Defendant switched sides in the ongoing litigation against TAXI. She had in her possession approximately 25,000 pages of TAXI's documents, which she provided to International Harvester. In exchange for her "expert" services during December 2002 and January 2003, International Harvester agreed to pay the Defendant $60,000.[5]

According to the Defendant, she did not owe any fiduciary duty to TAXI as its chief financial officer. She testified that she understood and appreciated that she generally owed fiduciary duties to TAXI as its chief financial officer – "except when it's in liquidation or bankruptcy." Trial Tr. (Dec. 3, 2007) at p. 49, lines 18-21. The Defendant explained that she had "read a whole article about it in a bankruptcy journal type article." Trial Tr. (Dec. 3, 2007) at p. 49, lines 23-24. She then went on to state that, as a certified public accountant, she was required to report suspected malfeasance "to the appropriate officials outside the company," if the company failed to take action, "which I did." Trial Tr. (Dec. 3, 2007) at p. 50, lines 5-7.

On or about January 21, 2003, Bell filed a lawsuit against the Defendant in the County Court at Law No. 2 for Dallas County, Texas, wherein he asserted claims for the amount due under the promissory note together with interest and attorneys' fees. Bell learned of the Defendant's decision to supply her services to the opposing part(ies) in TAXI's litigation against International Harvester at or around this time. Bell's lawsuit against the Defendant was pending when the Defendant filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 30, 2004. The Defendant was

---

[5] With respect to the services she provided to International Harvester, the Defendant testified: "Pretty much all I did was give the documents." Trial Tr. (Dec. 3, 2007) at p. 50, line 20.

unemployed as of the date she filed her petition, and she testified at trial that she had experienced several serious medical problems in the two years prior to bankruptcy.

The Defendant listed a claim against Bell in the amount of $189,000 in her bankruptcy schedules.  The Defendant described this claim as a counterclaim against Bell in Bell's state court lawsuit against her, and she represented to the Chapter 7 trustee at the meeting of creditors that the claim was for wrongful termination and unpaid wages.  The Defendant testified at trial and asserted in her post-trial brief that Bell owes her $189,000 for the accounting services she provided to his businesses in 2002.  *See* Trial Tr. (July 31, 2007) at p. 82, lines 3-14.

As of her petition date, the Defendant had not filed tax returns for at least the five years prior to bankruptcy.  At the meeting of creditors held on December 1, 2004 pursuant to §341 of the Bankruptcy Code, the Defendant admitted that, in 2003, she had received $30,000 from a friend in exchange for her claim against International Harvester for unpaid expert witness fees.  The Defendant represented to the Chapter 7 trustee that she did not owe any tax on her income in 2003, because her income was offset by other deductions.  The Defendant further represented to the Chapter 7 trustee that she had received a letter from the Internal Revenue Service requesting her to sign and return the letter if she did not owe any income taxes for 2003.

During the meeting of creditors, the Chapter 7 trustee asked the Defendant to provide numerous documents, including bank statements, cancelled checks, a copy of her 2001 tax return, a copy of the letter she claimed to have received from the Internal Revenue Service regarding her income taxes for 2003, and documentation of her income and expenses for 2003 and 2004.  The Defendant testified at trial that she provided the

Chapter 7 trustee with 100-200 pages of documents following the meeting of creditors. She also testified that she provided the same documents to Bell's attorneys in response to Bell's discovery requests.   However, her testimony regarding the production of documents to Bell's attorneys was not remotely credible.

With respect to the $25,000 promissory note, the Defendant contended that her signature on the promissory note was forged by Bell.  The Defendant denied that she was bitten by a dog in January 2002 or that she was wearing a medical device on her hand at the time she signed the promissory note, which might have affected the appearance of her signature.  The Defendant's testimony regarding whether her hand was injured in January 2002 was not credible and, moreover, was contradicted by her previous sworn testimony in which she stated that she was bitten on her right hand by a dog in January 2002.  The credible testimony of Bell's handwriting expert, Linda James, established that the disputed signature on the promissory note was, indeed, the signature of the Defendant.

At trial, the Defendant denied that she had destroyed documents "vital" to her financial records.  The Defendant, however, admitted that she routinely destroys copies of her cancelled checks and other records after reconciling them with her bank statements.  The Defendant testified that she continued this practice after she was sued by Bell and after Bell requested copies of her checks and financial records.

With respect to her failure to file a tax return in 2003, the Defendant opined that "[i]f you have no tax due and it's not taxable income, it is merely cash flow, then … you don't have to file a return."  Trial Tr. (July 31, 2007) at p. 104, lines 2-4.  The Defendant amended or supplemented her prior sworn statements to the Chapter 7 trustee regarding the $30,000 she received in 2003 by testifying at trial that the $30,000 she received for

10

her claim against International Harvester was "with recourse," meaning that if the purchaser was unable to collect her outstanding claim against International Harvester, then she would have to return the $30,000 to the purchaser. The Defendant's trial testimony was the only evidence that the purchase of her receivable from International Harvester was "with recourse." The Defendant's testimony that she supplied written records regarding this alleged "with recourse" agreement to Bell's attorneys was not credible.

The Defendant offered several explanations for her failure to file tax returns in the years prior to bankruptcy. She testified that she received "W-2s and stuff" before TAXI's liquidation, because "I prepared them." Trial Tr. (July 31, 2007) at p. 119, lines 19-20. She further testified that she had not filed tax returns because Bell and TAXI had failed to provide her with W-2s or 1099s after 2001. She also testified that she had not filed tax returns because Bell had thrown out all the personal records she had stored at his warehouse. She also testified that she did not file tax returns because her various deductions offset any income and, somewhat inconsistently, that she "usually" makes estimated tax payments. Trial Tr. (Dec. 3, 2007) at p. 55, lines 21-22.

At trial, the Defendant claimed to have "recently" filed tax returns for the years 1999 through 2004. [6] She did not provide copies of those returns to Bell in response to his outstanding discovery requests, and she failed to introduce her tax returns into the trial record. The Defendant's testimony that she provided her financial records to Bell's attorneys in November 2005 in response to their discovery requests was not credible.

---

[6] The Defendant first testified that she had filed her tax returns after March 31, 2004. *See* Trial Tr. (July 31, 2007) at p. 98, line 16. She then testified that she filed them "way after" the §341 meeting of creditors on December 1, 2004. *See* Trial Tr. (July 31, 2007) at p. 100, line 6. She finally testified that she had "very recently" filed her tax returns. *See* Trial Tr. (July 31, 2007) at p. 102, line 21.

Likewise, the Defendant's testimony that she provided copies of her correspondence with the Internal Revenue Service to Bell's attorneys was not credible. The Defendant produced no documentary evidence of (i) the return receipts she claimed to have received for documents that she testified she sent to Bell's attorneys by certified mail or (ii) the receipts she claimed to have received from Bell's attorneys for the documents she testified that she personally delivered to their offices.

## DISCUSSION

As a predicate legal matter, the Defendant asserts that the Court should grant her claim against Bell in the amount of $189,000. Bell correctly points out that this claim was not included in the parties' Joint Pre-Trial Order. Federal Rule of Civil Procedure 16(d), as adopted and applied to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7016, provides in pertinent part that a pre-trial order "controls the course of an action …." The Fifth Circuit has held on numerous occasions that a claim or defense not raised in the pretrial order may be deemed waived, even if it appeared in the complaint. *See, e.g., Elvis Presley Enters. v. Capece,* 141 F.3d 188, 206 (5th Cir.1998). Thus, in this case, the parties' Joint Pre-Trial Order supersedes the parties' prior pleadings and controls this action, and Bell's claim against the Defendant has been waived.

### A. Section 727 Causes of Action

Section 727 of the Bankruptcy Code provides that this Court must grant a discharge to a chapter 7 debtor unless one or more of the specific grounds for denial of a discharge listed in paragraphs (1) through (10) of §727(a) is proven to exist. The provisions for denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. *See Friendly Fin. Discount Corp. v. Jones (In*

12

*re Jones)*, 490 F.2d 452 (5th Cir. 1974).    Further, under Federal Rule of Bankruptcy

Procedure 4005, the burden of proof is on the party objecting to a debtor's discharge.

### *1. Section 727(a)(3)*

Maintenance of adequate financial records is a prerequisite to granting a discharge

in bankruptcy. Section §727(a)(3) provides:

> (a) The court shall grant a debtor a discharge, unless— . . . (3) the debtor
> has concealed, destroyed, mutilated, falsified, or failed to keep or preserve
> any recorded information, including books, documents, records and
> papers, from which the debtor's financial condition or business
> transactions might be ascertained, unless such act or failure to act was
> justified under all of the circumstances of the case . . . .

11 U.S.C. § 727(a)(3).    The purpose of this section is to give the trustee, creditors and the

bankruptcy court complete and accurate information concerning the status of the debtor's

affairs and financial history.  *See Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3rd Cir.

1992).

As the Bankruptcy Court for the Southern District of New York noted in *In re*

*Chachra,* 138 B.R. 397, 401 (Bankr. S.D. N.Y. 1992), the debtor has the initial obligation

to produce all records from which his or her financial condition might be ascertained.

The plaintiff then must establish "that the debtor's financial records are inadequate and

that this failure prevented the plaintiff from ascertaining the debtor's financial condition."

*Chemoil, Inc. v. Pfeifle (In re Pfeifle)*, 154 F. App'x 432, 433 (5th Cir. 2003) (citing

*Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir. 2003)).  "If this burden is

met, the burden shifts to the debtors to show the inadequacy is justified under all of the

circumstances."  *Id.* (citing *In re Dennis*, 330 F.3d at 703).  The Fifth Circuit has never

"delineated a precise threshold beyond which a debtor becomes accountable for further

recordkeeping." *Id.* at 435.  The bankruptcy court has "'wide discretion'" in both its

13

initial determination of whether the debtor maintained adequate records and the subsequent question of whether any failure to do so was justified, and its decisions constitute "finding[s] of fact reviewed for clear error." *In re Dennis*, 330 F.3d at 703 (quoting *Goff v. Russell Co. (In re Goff)*, 495 F.2d 199 (5th Cir. 1974)).

In assessing whether a debtor has offered a sufficient justification for not maintaining her financial records, the Court considers several relevant factors such as "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor or his business; and any other circumstances that should be considered in the interest of justice." *Meridian Bank v. Alten,* 958 F.2d 1226, 1230-31 (3rd Cir. 1992) (quoting *In re Wilson,* 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983)). "[A]ny explanation given by the Debtor to explain any deficiency in his records must be evaluated both for its credibility and reasonableness under the circumstances of this Debtor's affairs and degree of sophistication and for the materiality of any insufficiency." *In re Benningfield,* 109 B.R. 291, 293 (Bankr. S.D. Ohio 1989). However, a mere preference to avoid taxes is insufficient. *See In re Ross*, 367 B.R. 577, 581 (Bankr. W.D. Ky. 2007); *In re Wynn,* 261 B.R. 286, 305 (Bankr. M.D. Ala. 2001)

In this case, the Defendant failed to produce the documents Bell requested of her or to introduce documentary evidence of her financial condition at trial. The Defendant, for example, failed to file tax returns for the years prior to bankruptcy until the eve of trial, and she failed to produce copies of the tax returns to Bell prior to trial. Tax returns are "the 'quintessential documents' in a personal bankruptcy," *In re Dennis*, 330 F.3d at 703 (quoting *Nisselson v. Wolfson (In re Wolfson)*, 152 B.R. 830, 833 (S.D.N.Y. 1993)),

14

and the Defendant's failure to file timely tax returns, to produce her tax returns to Bell, to produce the documents underlying her tax returns, or to introduce the allegedly filed returns into evidence are factors for the Court to consider under §727(a)(3).

The Defendant's testimony that she did, in fact, produce her tax returns and other financial documents to Bell's attorneys was not credible. The only evidence of such was the presence of a binder full of documents in the courtroom.  The binder was not timely designated as an exhibit by the Defendant or provided to opposing counsel prior to trial, and none of its contents were introduced into the record.  The Defendant's testimony that she provided Bell's attorneys with copies of the documents contained in the binder, unsupported by any documentary evidence, is unavailing.  *See In re Gangemi,* 291 B.R. 242, 247 (E.D.N.Y. 2003) (affirming bankruptcy court's denial of discharge based on debtor's failure to submit admissible evidence in response to a motion for summary judgment).  *See also In re Grausz,* 302 B.R. 820, 827 (D. Md. 2002) (affirming bankruptcy court's denial of discharge where sophisticated debtor failed to produce adequate records in response to discovery requests).

The Defendant is a highly educated woman with extensive experience as an accountant.  She has taught accounting at local colleges and even professes to specialize in fraud and auditing.  *See* Trial Tr. (Dec. 3, 2007) at p. 42, lines 14-15.  She has nevertheless left the Court and Bell to guess as to her financial condition prior to bankruptcy.  This lack of evidence precludes the Defendant from obtaining a discharge under §727(a)(3).

### 2. Section 727(a)(5)

In his Complaint, Bell also seeks to bar the Defendant's discharge pursuant to §727(a)(5).  Section 727(a)(5) states that a debtor will be denied a discharge when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."  The initial burden of going forward with evidence is on the objector, who must introduce more than merely an allegation that the debtor has failed to explain losses. Once the objector has introduced some evidence of the disappearance of substantial assets or of unusual transactions, the debtor must satisfactorily explain what happened. *See First Texas Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 992-993 (5th Cir. 1983).

Here, Bell failed to establish any loss of assets by the Defendant.  Bell does not seek a denial of the Defendant's discharge based on §727(a)(5) in his closing briefs, but only a denial of her discharge based on §727(a)(3).  The Court, therefore, finds that the relief requested in the Bell's Complaint should be denied to the extent the Complaint requests a denial of the Defendant's discharge based on §727(a)(5).

### B.  Section 523 Cause of Action

Having found that the Defendant's discharge in bankruptcy should be denied pursuant to §727(a)(3), it is not necessary for the Court to discuss Bell's objections to the discharge of the Defendant's obligation to him.  The Court will nonetheless address Bell's remaining objection in order to provide the parties with a full discussion of the issues presented at trial.

The standard of proof for allegations under §523 of the Bankruptcy Code, like that of allegations brought under §727, is by a preponderance of the evidence.  *See*

*Grogan v. Garner*, 498 U.S. 279, 286 (1991).  "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).  Thus, without satisfactory proof of each element of the cause of action, judgment must be entered for the debtor.

Here, the Plaintiff asserts that the Defendant's obligations to him are nondischargeable under §523(a)(2)(A).  Section 523(a)(2)(A) of the Bankruptcy Code provides that:

> [A] discharge under §727 . . . of this title does not discharge an individual debtor from any debt for money, property, or services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. §523(a)(2)(A).  This section encompasses similar but distinct causes of action. Though other circuits have applied a uniform standard to all section 523(a)(2)(A) actions, the Fifth Circuit has distinguished the elements of "actual fraud" on the one hand and "false pretenses and false representations" on the other.  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995).

According to the Fifth Circuit, in order to be a false representation or false pretense, the representation must have been a knowing and fraudulent falsehood, describing past or current facts, that was relied upon by the other party.  *Id.* at 1293. Actual fraud requires the additional proof of the debtor's intent to deceive and a loss by the creditor which is proximately caused by the fraud.  *Id.* at 1293.  In coming to its decision in *RecoverEdge,* the Fifth Circuit declined to follow other circuits which had applied a uniform standard to all debts under §523(a)(2).

17

More recently, however, the Fifth Circuit has stated, without distinguishing between the different torts encompassed by §523(a)(2)(A), that for a debt to be non-dischargeable under that section, the creditor must show that (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result of his reliance. *General Elec. Capital Corp. v. Acosta (In re Acosta),* 406 F.3d 367, 371 (5th Cir. 2005). An intent to deceive may be inferred from a reckless disregard for the truth or the falsity of a statement combined with the sheer magnitude of the resulting misrepresentation. *Id.* Furthermore, silence as to material facts can constitute a false representation. *Id.*

Here, the documentary evidence and credible testimony establishes that the Defendant falsely represented to Bell that she intended to repay the $25,000 he loaned her for the purchase of a vehicle. Bell actually and justifiably relied on the Defendant's false representation by issuing her a check for $25,000. Bell's reliance was justifiable inasmuch as he had worked with the Defendant for nearly eight years, and he and the Defendant both testified that they held a high degree of mutual respect and trust for each other as of January 2002. The Defendant has not repaid Bell any portion of the $25,000 loan, and Bell has sustained a loss as a proximate result of his reliance of the Defendant's false representations. The Court, therefore, finds that the Defendant's obligation to the Plaintiff under the promissory note is non-dischargeable pursuant to §523(a)(2)(A).

### Attorneys' Fees

Under the "American Rule" applied in federal litigation, a prevailing litigant may

not collect attorneys' fees from his opponent unless such fees are authorized by federal statute or an enforceable contract between the parties.  *See In re Sheridan*, 105 F.3d 1164, 1166-67 (7th Cir. 1997).  The only statutory authorization for an award of attorneys' fees in a dischargeablity proceeding is found in 11 U.S.C. §523(d), which gives a prevailing debtor a right to attorneys' fees in certain cases.  With regard to a request by a prevailing creditor for his attorneys' fees, such fees form a part of a bankruptcy claim and can be nondischargeable where the creditor has a contractual right to them valid under state law. *See Jordan v. Southeast Nat'l Bank (In re Jordan)*, 927 F.2d 221, 226-27, *overruled on other grounds by Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257 (5th Cir. 1993). If the contractual right to attorneys' fees is valid and enforceable, that obligation becomes part of the "debt" deemed nondischargeable under 11 U.S.C. §523(a).  *See, e.g., In re Sheridan*, 105 F.3d at 1166-1167.

In this case, Bell, as the prevailing creditor, has no statutory right to his attorneys' fees under the Bankruptcy Code.  The promissory note contains no provision for attorneys' fees.  The Court, therefore, concludes that Bell failed to establish any right to recover his attorneys' fees from the Defendant.

## CONCLUSION

For the foregoing reasons, the Court finds that Claybrook's discharge should be denied pursuant to §727(a)(3).  However, Bell failed to establish the nondischargeability of his pre-petition attorneys' fees or any entitlement to post-petition attorneys' fees or costs in this action.  The Court will enter a Judgment consistent with this Memorandum Opinion.

Signed on 3/31/2008

*Brenda T. Rhoades*  MD

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE